# United States Court of Appeals
## For the First Circuit

No. 06-1843

MORGAN CALVI,

Plaintiff, Appellant,

v.

KNOX COUNTY ET AL.,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MAINE

[Hon. George Z. Singal, U.S. District Judge]
[Hon. David M. Cohen, U.S. Magistrate Judge]

Before

Boudin, Chief Judge,
Selya and Lynch, Circuit Judges.

Eric M. Mehnert, with whom Hawkes & Mehnert and Joseph Baldacci were on brief, for appellant.
Edward R. Benjamin, Jr., with whom Thompson & Bowie, LLP was on brief, for municipal appellees.
John J. Wall, III, with whom Monaghan Leahy, LLP was on brief, for county appellees.

December 11, 2006

**SELYA**, **Circuit Judge**. In this civil rights case, brought pursuant to 42 U.S.C. § 1983, plaintiff-appellant Morgan Calvi beseeches us to reverse the entry of summary judgment in favor of various county and municipal defendants.[1] In rapid-fire succession, she attacks the constitutionality of summary judgment, the district court's assessment of the evidence, and the court's concomitant refusal to consider certain claims on the ground that they were outside the compass of her complaint. Discerning no error, we affirm.

## I. BACKGROUND

The pivotal facts are laid out in considerable detail in the recommended decision of the magistrate judge, see Calvi v. City of Rockland, Civ. No. 05-11, 2006 WL 890687 (D. Me. Mar. 31, 2006), and we assume the reader's familiarity with that decision.

On January 19, 2003, a 911 operator, reacting to a male caller (later identified as Matthew Hayden) who had locked himself in his room because a woman was brandishing a knife in his house, dispatched Officer Kenneth Smith of the Rockland police department to 89 Talbot Avenue, Rockland, Maine. Several people, most of them unrelated, lived at that address. Smith was familiar with the

---

[1]Calvi also sued under the Maine Civil Rights Act, Me. Rev. Stat. Ann. tit. 5, § 4681 et seq. The issues on appeal, however, have been briefed and argued exclusively in terms of section 1983. Accordingly, we omit any further reference to the counterpart state statute.

locus, having gone there the day before to settle a dispute between Calvi and another tenant, Kevin Warren.

The dispatcher told Smith that Calvi had been identified as the knife-wielder. When Smith arrived at the residence, the landlord (Lawrence Frier) agreed to go inside and find Calvi. Around the same time, Warren — who had fled the scene — called the dispatcher and asked if it was safe to go back. Upon learning that the police were on the premises, he returned and played an audiotape for Smith. Warren told Smith that four people — he, Frier, Calvi, and Hayden — were present when the tape was made inside the dwelling. Apparently, Calvi had begun yelling at Warren because he "made faces" at her. When Warren (an alleged martial arts expert) approached Calvi, she snatched a butcher knife from the sinkboard.

On the tape, Calvi, obviously upset, could be heard launching a series of accusations at Warren. Frier could be heard imploring Calvi to be reasonable and, at one point, stating to her: "Morgan, that's a felony." Warren eventually fled, and Hayden called the police.

By the time that Frier located Calvi, another officer was at the scene. Calvi told Smith that she wanted to tell her side of the story. Smith, however, arrested her on the spot, charged her with criminal threatening with a dangerous weapon, see Me. Rev. Stat. Ann. tit. 17-A, § 209, and stated that she could relate her

version later. Frier gave Calvi bail money and told Smith to be gentle because she was frail and had recently undergone elbow surgery.

Smith placed Calvi in handcuffs and double-locked them behind her back so that they would not tighten. He then marched her outside, deposited her in his cruiser, and belted her in for transport to the Knox County jail. Smith's fellow officer, Sergeant Jeffrey McLaughlin, was at the scene but had no real interaction with Calvi; McLaughlin spent his time talking with Warren and Hayden.

When handcuffing Calvi and assisting her into the back seat of the cruiser, Smith, who had been trained as a paramedic, did not observe any debilitating condition. He did notice, however, that Calvi was crying during the five-to-six-minute drive to the jail. All in all, Calvi was handcuffed for no more than fifteen minutes.

While Calvi has several disabilities, the only one relevant here is a birth defect that required surgical straightening of three of the fingers on her left hand. Although this disability is painful, it has never prevented Calvi from doing routine activities such as dressing herself, feeding herself, or working at Wal-Mart.

Upon arriving at the lockup, Smith transferred custody of his prisoner to a Knox County correctional officer, Rebecca Gracie.

Gracie unlocked the handcuffs, patted Calvi down, and placed her in a holding cell. After other required aspects of the booking process had been completed, another Knox County officer fingerprinted Calvi. Gracie was present during the fingerprinting but had no direct involvement with Calvi at that stage.

Calvi claims that the officer who fingerprinted her repeatedly pushed her fingers down hard, in spite of being told that she had a hand deformity. She further claims that the fingerprinting caused injuries to her wrist and surgically repaired middle finger. Calvi eventually was released on bail that same day.

In due course, Calvi brought suit against Smith, McLaughlin, and Gracie (in each instance alleging excessive force) and against the City of Rockland, Knox County, and the county sheriff, Daniel Davey (in each instance alleging secondary liability, e.g., failure to supervise, failure to train). She did not sue, and has never sued, the Knox County correctional officer who fingerprinted her.

Following pretrial discovery, the various defendants moved for summary judgment. The district court referred the motions to a magistrate judge, see Fed. R. Civ. P. 72(b), who recommended that they be granted. See Calvi, 2006 WL 890687, at * 1. Over Calvi's objection, the district judge adopted the recommended decision and entered summary judgment in favor of all

-5-

defendants.[2]  See Calvi v. City of Rockland, Civ. No. 05-11, 2006 WL 1139924 (D. Me. Apr. 26, 2006).  This timely appeal ensued.

## II.  THE SUMMARY JUDGMENT STANDARD

It is common ground that appellate review of an order granting summary judgment is de novo and is confined to the record that was before the district court.  See Mandel v. Boston Phoenix, Inc., 456 F.3d 198, 204 (1st Cir. 2006).  In effecting such review, the court of appeals must take as true the facts documented in the record below, resolving any factual conflicts or disparities in favor of the nonmovant.  See Houlton Citizens' Coal. v. Town of Houlton, 175 F.3d 178, 184 (1st Cir. 1999).  The court must draw all reasonable inferences from the assembled facts in the light most hospitable to the nonmovant.  Id.  If — and only if — the facts, so marshaled, show "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law," Fed. R. Civ. P. 56(c), will the entry of summary judgment be affirmed.  See DePoutot v. Raffaelly, 424 F.3d 112, 117 (1st Cir. 2005).

In implementing the summary judgment standard, an issue is considered genuine if "it may reasonably be resolved in favor of either party" at trial.  Garside v. Osco Drug, Inc., 895 F.2d 46, 48 (1st Cir. 1990).  By like token, a fact is considered material

---

[2]Because the district judge and the magistrate judge shared the same appraisal of the case, we take an institutional view and refer to the decision below as that of the district court.

-6-

if it possesses "the capacity to sway the outcome of the litigation under the applicable law." Nat'l Amusements, Inc. v. Town of Dedham, 43 F.3d 731, 735 (1st Cir. 1995).

Of course, the nonmovant may defeat a summary judgment motion by demonstrating, through submissions of evidentiary quality, that a trialworthy issue persists. Celotex Corp. v. Catrett, 477 U.S. 317, 322-24 (1986). Doing so, however, requires more than the frenzied brandishing of a cardboard sword. As we have warned, "a conglomeration of 'conclusory allegations, improbable inferences, and unsupported speculation' is insufficient to discharge the nonmovant's burden." DePoutot, 424 F.3d at 117 (quoting Medina-Munoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990)).

It is with this standard in mind that we turn to Calvi's claims of error.

## III. THE CONSTITUTIONAL CLAIM

In a broadside directed at the district court proceedings as a whole, Calvi contends that summary judgment is an unconstitutional abridgement of her Seventh Amendment right to trial by jury. That contention is hopeless.

Summary judgment has a unique place in federal civil litigation. Its "role is to pierce the boilerplate of the pleadings and assay the parties' proof in order to determine whether trial is actually required." Wynne v. Tufts Univ. Sch. of

-7-

Med., 976 F.2d 791, 794 (1st Cir. 1992). "The device allows courts and litigants to avoid full-blown trials in unwinnable cases, thus conserving the parties' time and money, and permitting courts to husband scarce judicial resources." McCarthy v. Northwest Airlines, Inc., 56 F.3d 313, 315 (1st Cir. 1995). So viewed, a grant of summary judgment does not compromise the Seventh Amendment's jury trial right because that right exists only with respect to genuinely disputed issues of material fact. See Harris v. Interstate Brands Corp., 348 F.3d 761, 762 (8th Cir. 2003).

Not uniquely, the District of Maine's local rules require the filing, with every motion for summary judgment, of a short and concise statement of the material facts, with appropriate record references. See D. Me. R. 56(b). A related rule provides in pertinent part that "[a] party opposing a motion for summary judgment shall submit with its opposition a separate, short, and concise statement of material facts [which] shall admit, deny or qualify the facts by reference to each numbered paragraph of the moving party's statement of material facts and unless a fact is admitted, shall support each denial or qualification by a record citation." Id. 56(c). Calvi asserts, without any citation to persuasive authority, that these rules are unconstitutional because they ensure a trial by paper that, in the final analysis, is no trial at all. This assertion is baseless.

The District of Maine's local rules and similar local rules in other districts within this circuit were developed in response to this court's stated concern "that, absent such rules, summary judgment practice could too easily become a game of cat-and-mouse." Ruiz Rivera v. Riley, 209 F.3d 24, 28 (1st Cir. 2000). Such local rules are useful devices for focusing a district court's attention on what is — and what is not — genuinely controverted. Such rules are desirable in other ways as well. For one thing, they have the capacity to dispel the smokescreen behind which litigants with marginal or unwinnable cases often seek to hide. For another thing, they greatly reduce the possibility that the district court will fall victim to an ambush. Cf. Stepanischen v. Merchants Despatch Transp. Corp., 722 F.2d 922, 931 (1st Cir. 1983) (warning that, without such a rule, the justice system risks the "specter of district court judges being unfairly sandbagged by unadvertised factual issues").

In view of these considerations and the lack of any cogent constitutional objection, we have regularly upheld challenges to the constitutionality and fairness of such local rules. See, e.g., Cosme-Rosado v. Serrano-Rodriguez, 360 F.3d 42, 45 (1st Cir. 2004); Ruiz Rivera, 209 F.3d at 28; Jaroma v. Massey, 873 F.2d 17, 20 (1st Cir. 1989). Calvi has offered us no sound reason for revisiting these decisions. Consequently, we hold that

D. Me. R. 56(b) and (c), like Fed. R. Civ. P. 56 itself, do not violate the Seventh Amendment.

## IV.  THE EXCESSIVE FORCE CLAIMS

We turn next to Calvi's excessive force claims. Because the City of Rockland defendants are situated somewhat differently from the Knox County defendants, we divide this portion of our analysis into two segments.

### A.  __The Rockland Defendants__.

Counts 1 and 4 of Calvi's complaint allege in substance that the Rockland police officers used excessive force when handcuffing Calvi. In order to prevail on such a claim, a plaintiff must establish that the defendant's actions in handcuffing her were objectively unreasonable in light of the circumstances and the facts known to the officer at the time. See Graham v. Connor, 490 U.S. 386, 397 (1989); Isom v. Town of Warren, 360 F.3d 7, 10-11 (1st Cir. 2004); see also Alexis v. McDonald's Rest. of Mass., Inc., 67 F.3d 341, 352 (1st Cir. 1995). This showing must take into account the reasonableness of the officer's actions, viewed from the perspective of a prototypical officer confronted with the same or similar circumstances. Graham, 490 U.S. at 396. All of the attendant facts must be considered. See id. Police work is often carried out in fast-moving and poorly defined situations, so it is especially unfair to judge an officer's actions in hindsight. See id. at 396-97.

-10-

Applying this framework, it is readily apparent that the entry of summary judgment in Sergeant McLaughlin's favor is unimpugnable. There is not a shred of evidence that McLaughlin had anything to do with Calvi's handcuffing. His mere presence at the scene, without more, does not by some mysterious alchemy render him legally responsible under section 1983 for the actions of a fellow officer. See Gaudreault v. Municipality of Salem, 923 F.2d 203, 207 n.3 (1st Cir. 1990).[3]

The case against Smith is slightly more robust — but not robust enough to fend off summary judgment. Smith was responding to news that a civilian had been brandishing a knife in a dangerous manner. Even if Smith knew that the knife-wielder, Calvi, had a hand deformity, there is no evidence that he applied any excessive force. Standard police practice called for cuffing an arrestee's hands behind her back and Smith's decision not to deviate from this practice was a judgment call, pure and simple. He handcuffed Calvi in the customary manner and kept her in handcuffs for no more than the time reasonably necessary to transport her to the lockup.

---

[3]To be sure, a bystander-officer who has a realistic opportunity to prevent the use of excessive force by a fellow officer may in certain circumstances be held liable for a failure to intervene. See, e.g., Martinez v. Colon, 54 F.3d 980, 985 (1st Cir. 1995) (explaining that "police officers sometimes have an affirmative duty to intervene that is enforceable under the Due Process Clause"); Gaudreault, 923 F.2d at 207 n.3 (similar). Here, however, Calvi did not timely charge McLaughlin with a failure to intervene. See Part V, infra.

That is the end of the story.  The totality of the circumstances affords no legally sufficient basis for a finding that Smith's handcuffing of Calvi represented a constitutionally proscribed use of excessive force.  Cf. Jackson v. City of Bremerton, 268 F.3d 646, 653 (9th Cir. 2001) (concluding that officer did not use excessive force in pushing suspect to the ground and kneeling on her back, notwithstanding the suspect having complained of preexisting injuries).  Accordingly, the district court did not err in granting summary judgment for Smith.

In addition to her claims against the two individual members of the Rockland police department, Calvi attempts to hold the City of Rockland responsible for the officers' alleged use of excessive force.  She argues that Rockland should be held liable under section 1983 because it failed adequately to train its police force.[4]  This argument is unavailing.

With respect to an allegation of failure to train, liability ordinarily may be found "where the municipality fails to provide adequate training notwithstanding an obvious likelihood that inadequate training will result in the violation of constitutional rights." Whitfield v. Meléndez-Rivera, 431 F.3d 1,

---

[4]Calvi originally made a related argument: that the City had a policy or custom that led to the violation of her civil rights. She now backpedals, conceding that the Rockland police department had adopted an appropriate policy for handcuffing disabled individuals.  Before us, she seeks to hold the City liable based only on its alleged failure adequately to train Smith.

10 (1st Cir. 2005). Showing that a single individual received inadequate training is insufficient for municipal liability to attach; the training program as a whole must be found faulty. See City of Canton v. Harris, 489 U.S. 378, 390-91 (1989).

Here, Calvi has not presented a scintilla of evidence demonstrating that Rockland's police force, overall, is inadequately trained in how to handcuff disabled suspects. The only record evidence is to the contrary: Rockland's officers must attend the Maine Criminal Justice Academy, and training in arresting individuals with physical disabilities is part of the Academy's core curriculum.

We need not probe this point too deeply for — regardless of the training afforded or the lack of training — it is only when a governmental unit's employee inflicts a constitutional injury that the governmental unit can be held liable under section 1983. See Evans v. Avery, 100 F.3d 1033, 1039 (1st Cir. 1996). It follows that the inadequate training of a police officer cannot be a basis for municipal liability under section 1983 unless a constitutional injury has been inflicted by the officer or officers whose training was allegedly inferior. See Young v. City of Prov. ex rel. Napolitano, 404 F.3d 4, 25-26 (1st Cir. 2005).

That ends this aspect of the matter. As explained above, Calvi has utterly failed to generate a trialworthy issue as to the use of excessive force in the handcuffing process by either Smith

or McLaughlin. Since no Rockland police officer inflicted a constitutional injury on Calvi, she cannot hold the City liable under section 1983 for its officers' alleged lack of training.

## B. **The Knox Defendants**.

Calvi claims that Knox County and its officers should be held liable because of excessive force used during booking (and, especially, during fingerprinting). This claim need not detain us.

Calvi never sued the officer who actually fingerprinted her. Instead, her excessive force claim is directed at Gracie (who, although a supervisory officer, was a mere observer of the fingerprinting). Absent evidence of participation, concerted action, or at least culpable knowledge, one officer cannot be held jointly liable under section 1983 for another officer's use of excessive force. See, e.g., Gaudreault, 923 F.2d at 207 n.3; see also Monell v. Dep't of Social Servs., 436 U.S. 658, 692-94 (1978) (holding that respondeat superior is inapplicable in section 1983 cases). There is no such evidence in this record. Thus, the district court did not err in entering summary judgment in Gracie's favor.

This leaves the claim against Knox County.[5] The facts of record, viewed in the light most favorable to Calvi, demonstrate

[5]Although Sheriff Daniel Davey has been sued, Calvi acknowledges that she sued him only in his official capacity. A suit against a public employee in his official capacity is a suit against the individual's employer, here, Knox County. See Will v. Mich. Dep't of State Police, 491 U.S. 58, 71 (1989).

-14-

that Knox County had in place an appropriate policy for fingerprinting disabled persons. Even if that policy was not followed in this instance, as Calvi alleges, that omission, standing alone, would not amount to a constitutional violation attributable to the county. See St. Hilaire v. City of Laconia, 71 F.3d 20, 29 (1st Cir. 1995).

There is, moreover, no evidence of any pervasive failure to train county law enforcement officers in the implementation of the county's fingerprinting policy. For that matter, there is no evidence that the officer who actually fingerprinted Calvi lacked proper training.

To say more on this point would be supererogatory. The upshot is that the district court correctly concluded that the Knox County defendants were entitled to summary judgment.

## V. THE UNPLED CLAIMS

There is one more leg to our journey. Calvi objects to the district court's determination that she failed properly to plead certain claims (and, therefore, waived them). We turn now to that objection.

The essential facts are as follows. In her opposition to the defendants' motions for summary judgment, Calvi for the first time asserted a false arrest claim against Smith and failure to intervene claims against McLaughlin and Gracie. None of these newly minted claims had been articulated, or even vaguely

-15-

insinuated, in Calvi's complaint. The magistrate judge deemed the claims waived, Calvi, 2006 WL 890687, at *7, and the district judge agreed.

Calvi argues, in effect, that the Civil Rules require only notice pleading, and that notice of the incident subsumes within it notice of any and all claims arising out of the described nucleus of operative facts. The first part of her premise is correct; this court has held that there are no heightened pleading standards for civil rights cases and that, therefore, notice pleading rules apply to such actions. See Educadores Puertorriqueños en Acción v. Hernández, 367 F.3d 61, 66-67 (1st Cir. 2004). Thus, a plaintiff's complaint need only contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Id. at 66 (citing Fed. R. Civ. P. 8(a)(2)).

The second part of Calvi's premise is incorrect. Notice pleading rules do not relieve a plaintiff of responsibility for identifying the nature of her claim. See Gooley v. Mobil Oil Corp., 851 F.2d 513, 514 (1st Cir. 1988) (explaining that although the requirements of Rule 8(a)(2) are minimal, "minimal requirements are not tantamount to nonexistent requirements"). Consequently, the statement of claim must, at a bare minimum, "give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." Educadores, 367 F.3d at 66 (quoting Conley v. Gibson, 355 U.S. 41, 47 (1957)). This means that, in a civil

-16-

rights action, as in any other civil action subject to notice pleading requirements, the statement of claim must "at least set forth minimal facts as to who did what to whom, when, where, and why." Id. at 68.

As the district court recognized, Calvi's complaint offends these rudimentary principles insofar as her unpled claims are concerned. In her complaint, she alleges that "with reckless and deliberate disregard for [her] rights," Smith "physically abuse[d] her and treat[ed] her cruelly and callously, using force far in excess of that necessary under the circumstances, all in violation of her rights." This language is sufficient to plead an excessive force claim but not a false arrest claim. At no point in the complaint did Calvi say anything to place Smith on notice that she was claiming false arrest.

Calvi's argument that her false arrest claim is implicit in her excessive force claim lacks merit. Other courts have held that an excessive force claim is not implicit in a false arrest claim but, rather, must be stated distinctly. See, e.g., Bashir v. Rockdale County, 445 F.3d 1323, 1331-32 (11th Cir. 2006); cf. Iacobucci v. Boulter, 193 F.3d 14, 19 (1st Cir. 1999) (recognizing that false arrest and excessive force are separate and distinct claims). We think that the reverse is equally true: a false arrest claim is not implicit in an excessive force claim but, rather, must be stated distinctly.

Much the same is true of Calvi's nascent failure to intervene claims. Her complaint named McLaughlin and Gracie as defendants but limned only claims of excessive force against them. Neither a duty to intervene nor a breach of that duty was alluded to in any way, shape, or form. Calvi's argument rests, therefore, on the proposition that a failure to intervene claim is implicit in an excessive force claim directed at multiple defendants. We reject that proposition.

The short of it is that, as the district court held, Calvi was not entitled to raise new and unadvertised theories of liability for the first time in opposition to a motion for summary judgment. See Torres-Rios v. LPS Labs., Inc., 152 F.3d 11, 15-16 (1st Cir. 1998).

## VI. CONCLUSION.

We need go no further. For the reasons elucidated above, we uphold the district court's entry of judgment in the defendants' favor.

_____

**Affirmed**.

-18-